IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA      )
                           )
        v.                ) Criminal No.  1:16cr227
                           )
HARIS QAMAR             )
                           )

## DEFENDANT'S POSITION WITH RESPECT TO SENTENCING

Haris Qamar, by and through counsel, in accordance with 18 U.S.C. § 3553(a) and

Section 6A1.2 of the Sentencing Guidelines and Policy Statements submits this memorandum

regarding the sentencing factors.

**Advisory Sentencing Guidelines.**

The defense does not dispute the calculation of the sentencing guidelines by the probation

office pursuant to U.S.S.G. § 2M5.3 at offense level 26, criminal history category I, and adjusted

as mandated by § 3A1.4, to offense level 38, criminal history category VI.  The offense is

reduced by 3 levels to offense level 35 for acceptance of responsibility, 262-327 months.

The defense requests the Court to consider a substantial variance in this case based on the

factors set forth in 18 U.S.C. § 3553(A). The initial guideline is level 26, criminal history

category I, 63-78 months.  With the 3 level reduction for acceptance of responsibility, the

guideline ranges becomes 46-57 months.  The § 3A1.4(a) adjustment increases the guideline

range from level 26 to level 38, criminal history category VI, 360-life.  With a 3 level reduction

for acceptance of responsibility the guideline range becomes 292-265 months.  The guideline

range clearly exceeds the maximum statutory sentence of 240 months for this offense.

1

The Court, in *United States v. Benkahla*, 501 F. Supp. 2d 748, 759 (E.D. Va 2007), determined that § 4A1.3 gave the Court the authority to depart downward where § 3A1.4 "clearly over-represents the serousness of [the] criminal history" of "an individual with no criminal history and no evidence of ever having committed an illegal act in his life outside the conduct for which he is convicted." The Court also found that increasing the criminal history category to VI also over-represented the likelihood that Benkahla would commit other crimes, lacking the "same likelihood of recidivism, the difficulty of recidivism, or the need for incapacitation" *Id.* at 759. Alternatively, the held that "a variance sentence was necessary to serve the factors set forth in §3553(a)" which "provides that a court shall impose a sentence '*sufficient, but not greater than necessary*' to reflect" the factors set forth in § 3553(a).

On review, the Fourth Circuit noted that the government called the calculation of the criminal history category "baseless" and "mystifying" but that the sentence imposed "did not constitute an abuse of discretion" when treated as a variance. The Fourth Circuit, in dicta, stated,

> 'As far as the law is concerned, the judge could disregard the Guidelines and apply the same sentence . . . in the absence of the special facts.' . . .'When applying the Guidelines in an advisory manner, the district court can make factual findings using the preponderance of the evidence standard.' The point is thus that the Guidelines must be advisory, not that judges may find no facts . Here, in the case in which the district court slashed the defendant's Guidelines sentence in half, no one could doubt that the Guidelines were advisory. (Internal citations omitted)

*United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008). *See United States v. Ali*, 528 F.3d 210, 260 (4th Cir. 2008).

Courts in this district and other districts have granted downward departures or variances to arrive at a sentence "sufficient, but not greater than necessary."

Criminal history VI clearly overstates Haris's history of criminal activity which is zero.

2

Haris has no arrests or conviction or pending charges.  In high school, Haris thought about majoring in criminal justice but he was interested more in math and science.  But for the FBI's instigation, Haris would not have committed the offenses and is not going to be a recidivist.

Likewise, an offense level of 38 with a 3 level reduction for acceptance to level 35, over states the criminal conduct in this case.  Haris was not in contact with anyone from ISIL.  Nor did he try to recruit anyone to travel overseas to join ISIL.  The FBI learned of Haris's aborted attempt to travel overseas over a year after it occurred and only because Haris told the confidential informant (CI) about it.  During the time between his aborted travel attempt and meeting the CI, Haris did nothing but go to work, go to school and study and go play video games.  Haris was active on Twitter during this time but he did not attempt to recruit anyone or incite anyone into committing violent acts.

## 18 U.S.C. § 3553(A) Sentencing Factors.

**1.**     **A.  Nature and circumstances of the offense.**[1]

In July 2014, Haris purchased an airline ticket to fly from Newark, New Jersey to Istanbul, Turkey.[2]  Haris hoped to avoid arrest in Turkey and travel to Syria to join ISIL.  Haris never made the flight to Turkey because Haris's parents had possession of the family's passports and refused to give him his passport.  Haris made no further attempts to travel overseas.  Haris was active on Twitter for a period of time which brought him to the attention of the FBI.

---

[1]The statements and information contained in the in this section regarding the nature and circumstances of the offense are taken from FBI reports and FBI audio recording of the conversations between the CI and Haris.

[2]This was the aborted attempt by Haris to travel overseas that Haris told the CI about over a year after it occurred.  FBI was not aware of Haris purchase of a plane ticket and his attempt to go overseas until Haris told the CI.

In May 2015, the FBI initiated an investigation of Haris and had a CI befriend Haris.  In an effort to have Haris take steps to join ISIL, the CI informed Haris that he could apply for a new passport if he obtained a copy of his birth certificate.[3]  While Haris showed some interest in obtaining his birth certificate, he told the CI he would have to pray on it.  Later, when the CI asked Haris about obtaining the birth certificate, Haris told the CI that he never prayed on it but played video games instead.  Haris told the CI that he was not ready to go and wanted to chill here.  Ultimately, Haris never took any steps to obtain his birth certificate or a passport so he could travel overseas.

Since Haris took no steps to obtain a passport to go overseas and join ISIL, the FBI had the CI approach Haris with a plan to purchase Google Play Cards.  In January 2016, the CI informed Haris that the CI's cousin overseas was asking the CI to purchase $10 Google Play Cards which would be used by ISIL to provide travel instructions to individuals who wished to join ISIL.  After the CI explained what Google Play Cards were to Haris, the CI informed Haris that the card's codes would be sent to his cousin overseas.  Haris agreed to assist the CI in obtaining the Google Play Cards but Haris had no money to purchase the cards.  The CI gave Haris $40 to purchase four cards which Haris did.  After giving the CI four $10 Google Play Cards purchased with the CI's funds, Haris assisted the CI in sending the cards' codes to the CI's cousin overseas.[4]  Haris promised to obtain additional cards for the CI.  Later when asked by the CI why he had not purchased any Google Play Cards, Haris told the CI that he had other expenses

---

[3]Haris could have applied for a new birth certificate from the State of New York by submitting an application, a copy of his driver's license and $30.

[4]The codes for the Google Play Cards were not sent to the CI's cousin overseas but to a phone controlled by the FBI.

which he had to meet and would obtain the cards after he was paid.  The CI complained that Haris's other expenses were purchasing cigarettes and food.  The CI again offered to give Haris cash to purchase the cards.  The CI and Haris purchased Google Play Cards with cash provided by the CI.  Haris again assisted the CI in sending the cards' codes to the CI's cousin overseas. Haris eventually did purchase two $10 Google Play Cards with his own funds which he gave to the CI and assisted the CI in sending the cards' codes to the CI's cousin.

In May 2016, the CI informed Haris that the CI's cousin was producing a video and wanted the CI to take photos of the Washington, D.C area.  When the CI asked Haris what he would like to see on the video, Haris named the White House, Capitol Hill, Viet Nam Memorial, WWII Memorial, the Pentagon and the George Washington Bridge and the 395 bridge.  The CI asked Haris to assist him in taking the photos around Washington, D.C. which Haris did.

When they first met, Haris told the CI that option one was fighting jihad and option two was transferring to another school after finishing at NOVA.  Although Haris made outrageous statements to the CI regarding joining ISIL and fighting jihad, he never initiated any steps to carry out option one joining ISIL and fighting jihad.  Haris was all talk and no action before the FBI initiated its plans.  It was the FBI, through the CI, who got get Haris to buy Google Play Cards and to assist in taking photographs of Washington, D.C.

Haris was implementing option two, by continuing his education.  Haris told the CI that he wanted to be a civil engineer, build Saudi roads and see Muslim nations advance with regard to their roads and sewer systems.  Prior to his attempt to go overseas, Haris was a poor student, skipping classes and receiving poor or failing grades.  After his aborted plans to go overseas, he became serious about his education, attending classes, studying, getting good grades and was on

schedule to complete his classes and transfer to Virginia Commonwealth University (VCU) or another college.  Haris hoped to go to VCU in the Spring or to a school that would give him the most money or financial aid.  Haris asked the CI if he would come and visit Haris if was accepted to VCU in the Spring and got an apartment.

**B.  Defendant's background.**

Haris was born in Brooklyn, New York, his parents having emigrated from Pakistan. Haris's father is a taxi driver who is exceptionally well read having hundreds of book in all types of subjects including philosophy and history.  Haris's father is very old school and very tough on his sons wanting them to do well.  This caused conflict in the house.  Haris's mother is a homemaker with who is suffering from serious physical and mental health issues and has become extremely despondent over Haris's situation.  Haris has two brothers, one employed in Texas and the other is in high school.

**Education and Employment**

After graduating from Robinson High School in 2008, Haris was employed as a teller at Wacovia Bank from 2009 to 2013 until he quit to work for Public Storage.  During 2016, while attending school, Haris worked full-time, eight hours a day, five days a week including Saturdays and Sundays, for Public Storage as a relief manager.  Haris gave his parents most of the money he earned to help with the family's bills and expenses.

On Tuesdays and Thursdays, Haris attended NOVA.  Haris obtained his associate degree from NOVA in June 2016 with a GPA of 3.1 which was excellent considering how poorly his grades were when he began college.  Before being arrested, Haris was planning to take additional courses in the Fall 2016 and transfer to VCU or another college in the Spring 2017.  Haris's

father wanted Haris to become a doctor or lawyer but Haris enjoys math and science and wants to be an civil engineer like his uncle in California.  Haris would like to work for his uncle after graduation.  A letter from Haris is attached.

**Video Games**

Besides attending school, Haris's passion is video games.  Haris spent much of his free time playing video games at home and at the Cave, a video game center operated by Haris's friends who allowed him to play for free.  At one point, Haris nearly failed school because he became so involved in playing a new video game.  Haris told the CI that he once play video games for 184 hours over 3 weeks at the Cave.  Haris asked the CI if he wanted to go in with him to buy Battlefield, a video game.

**Outrageous Statements**

The presentence report and the government point to the outrageous statements by Haris on Twitter and to the CI.  While Haris's statements were insensitive and reckless, he never attempted to incite action or do anything to assist ISIL.  But for the FBI through the CI asking for his assistance, Haris would have continued his education without incident.  Statements such as cutting off heads with a butter knife and sticking his hands down the throat and drinking the blood or sticking his hand in to make it nice and warm was nonsensical.  Haris was like a teenager who glorified the killing and mayhem he saw on war movies.  Haris attention span on the subject of ISIL was short-lived and he would begin talking about school or video games.

The government points to Haris telling the CI that it was beautiful watching a prisoner being run over by a tank.  The government omits Haris's explanation to the CI that the reason the prisoner was run over by a tank because the prisoner had intentionally run over a number of

7

civilians with the tank before he was captured.  While Haris told the CI that he believed in

suicide bombing, he did not want to put on a bomb but rather wanted to open a restaurant like a

Chipolte.

The comments made by Haris were made without thought.  The outrageous statements

made by Haris were not intended to incite violence but were a venting of his frustration at seeing

women and children being killed.  Haris has never owned a firearm nor taken any steps to

commit a violent act or incite a violent acts by others.  He has never attempted to recruit anyone

for ISIL or any other terrorist organization.

**Stories Made Up By Haris**

Haris made up the story he told the CI about his cousins joining dawlah and dying

shaheed.  None of Haris's relatives have died fighting.  Haris also made up the story he told the

CI that his parents were going to sign their house over to him when they got older and that his

parents had signed their land in Pakistan over to him.  While it was true that when Haris and his

brother were about 10 and 11, they attended cadet school in Pakistan.  But neither Haris nor his

brother ever fired a rifle or any other weapon while at the school and did not have a week of

survival training in the Himalyas.  None of these stories that Haris told the CI were true.

**Daniel Goldman**

In April 2016, Haris and the CI ran into Daniel Goldman, a Jewish friend of Haris's

family.  Goldman had attended school with Haris's younger brother and they were close friends.

Haris had last seen Goldman several years before when Goldman was at Haris's parents' house

eating food from the refrigerator.

On this occasion in April 2016, Goldman was intending to sleep in his car having been

8

kicked out his parent's home and none of Goldman's friends were willing to help him.  Goldman, who was bi-polar and had not been taking his medication, told Haris and the CI about posting on Wikileaks, writing a code to get music off iTunes, hacking PayPal and Amazon.  Haris did not know if what Goldman was telling them about hacking PayPal and Amazon was true, Goldman was a software engineer and computer whiz, having graduated from Virginia Tech with a degree in computer science.  Nonetheless, Haris offered to let Goldman stay at his parent's house but told Goldman not to bring his (Goldman's) computer in the house or to use any of the computers in the house.  That evening Goldman was fed by the Qamars and talked through the night with Haris.  Haris told Goldman about attending VCU and obtaining his degree and becoming a doctor or civil engineer.  Haris told Goldman, "Get a job, get on your medication, and go home to your family.  They love you so be respectful of them.  You are a good friend and I want you to be healthy."  After spending the night at Haris's house, Haris saw that Goldman went to the doctor to get his medication.  Haris told the CI that it appeared that Goldman was suffering from a mental breakdown.  (A letter from Daniel Goldman letter is attached with letters from family and friends as Attachment A.)

**Letters from Family and Friends**

The attached letters from family and friends (Attachment B) attest to Haris as a kind and generous man who goes out of his way to help others both with his time and financially.  The Qamars lost all of their savings in the stock market crash in 2007 and are living hand to mouth.  Haris gave most of the money that he earned to his parents to assist them in paying bills.  Haris also paid for his younger brother's tuition one semester so that he would not have to leave school to work .

9

The letters speak of Haris going out of his way to provide transportation to and from work for a friend and the friend's mother who could not afford a car and for other friends who had no means of transportation.  A family friend who is a general contractor pointed out that Haris would help him put up drywall, help move large equipment, assist with plumbing and carry tools.

**2.      The sentence will adequately and reasonably reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  The sentence will afford adequate deterrence to criminal conduct and will adequately and reasonably protect the public from further crimes of the defendant.**

A variance below the guideline range will reasonably reflect the seriousness of the offense and provide a just punishment and reflect the seriousness of the offense.  There is no indication from the FBI reports and the recorded audio conversations between the CI and Haris, that Haris would have attempted to join or to assist ISIL in any manner but for the instigation by the FBI through its CI.  Unlike Benkahla who traveled to Pakistan to take part in terrorist training and who denied his culpability and went to trial, Haris began cooperating immediately upon his arrest and agreed to be debriefed without counsel.

It was the FBI through its CI that instigated the acts Haris committed.  Haris did not even know what Google Play Cards were until the CI informed him.  In all, Haris bought two Google Play cards with his own money.  The CI provided the money for the rest of the cards Haris purchased. Nor did Haris have any thoughts of taking photos for the making a propaganda video until the CI brought up the subject.  Haris was content with going to school, playing video games and making outrageous statements on Twitter.[5]

---

[5]The reason Haris opened so many Twitter accounts was that he would be locked out of his account by Twitter almost immediately after posting a statement on Twitter, forcing him to

As time went on and Haris became involved with school, he went on Twitter less and less and he frequently avoided the CI because Haris was uncomfortable with the CI's rudeness toward others. The reports indicate that Haris often told the CI that he was busy and could not meet when, in fact, Haris did not want to meet with the CI.

Haris has no arrests or convictions. He was completely cooperative with the FBI when he was arrested and agreed to be debriefed without counsel. Haris has continued to be completely cooperative with the government after the appointment of counsel. Upon having counsel appointed, Haris immediately agreed to plead guilty to the charges. Haris has agreed to sit down with the FBI to discuss the reasons why he believes individuals are drawn to extremist groups and what the FBI and the government may be able to do to prevent such occurrences.

There is little if any likelihood that recidivism will be an issue with Haris. His arrest and incarceration have scared Haris straight. Haris understands the seriousness of the offense he committed and all he wants to do now is to attend college to complete his education and become a civil engineer like his uncle in California. Haris wants to be able to take care of his parents as they grow older. Haris is very concerned about his mother who has health issues and has become despondent over Haris's arrest and incarceration.

A term of incarceration of 60 to 72 months would be sufficient and not greater than necessary to reflect the seriousness of Haris's offense, provide a just punishment for Haris's offenses, afford an adequate deterrence and protect the public. A sentence at or near the statutory maximum of 240 months is just overkill and would do more harm than good to Haris and to

---

attempt to open another Twitter account. Eventually, Twitter would lock out Haris immediately after he attempted to open a new account.

society.  Such a sentence would put another soul into an overcrowded prison system and further burden the taxpayers for no good reason.  This is not the kind of case or defendant that requires a sentence at or near the maximum.

**3.      The sentence is necessary to provide the defendant with needed educational training, medical care, and other correctional treatment in the most effective manner.**

Haris will take advantage of any college courses or other educational training available to further his college education.  Haris might also benefit from an evaluation and counseling if needed.

**4.      Types of sentences available.**

The guidelines calculated by the probation office suggest a term of incarceration beyond the maximum sentence of 240 months for this offense.  The guidelines without the terrorism enhancement calls for a term of incarceration of 63-78 months.  There is no mandatory minimum term of incarceration.  As noted above, the Court may impose a downward departure or variance sentence of less than 240 months and Haris asks the Court to consider such a sentence.

**5.      Whether the sentence will create an unwarranted disparity between the defendant and others with similar records who have been found guilty of similar conduct.**

Other defendants in the Eastern District of Virginia who have been sentenced for similar charges have received the following sentences:[6]

*United States v. Jalloh*, 1:16cr163 (E.D. Va. 1017)

Jalloh pleaded guilty to attempting to provide material support to ISIL.  Jalloh came into

---

[6]Other case pending sentencing are *United States v. Wehelie* which is scheduled for sentencing on March 17, 2017; *United States v. Khaweis* which is scheduled for trial on May 3, 2017; *United States v. Young* which has not been scheduled for trial; *United States v. Niknejad* in which there is an outstanding warrant for the defendant.

into contact with an individual who Jalloh knew to be an ISIL figure plotting attacks on United

States soil.  Jalloh was arrested after purchasing an AR-15 firearm which he believed would be

used in an attack on United States soil.  Jalloh, a former member of the Army National Guard,

also attempted to join ISIL while in Africa and, on numerous occasions provided ISIL with

money.  In addition to the enhancement pursuant to U.S.S.G. § 3A1.4, Jalloh received an

enhancement pursuant to § 2M5.3(B)(1)(E) for providing ISIL with funds resulting in a level 37,

criminal history category VI (360-life).  The government sought the statutory maximum sentence

of 240 months and Jalloh sought a sentence of 78 months.  The court sentenced Jalloh to a

variance sentence of 132 months.

     *United States v. Farrokh*, 1:16cr20 (E.D. Va. 2016)

     Farrokh pleaded guilty to attempting to provide material support to ISIL by providing

personnel.  Farrokh and Mahmoud Amin Mohamed Elhassan[7] planned to travel overseas to Syria

to join ISIL.  Farrokh's guidelines after the application of U.S.S. G. § 3A1.4 and a reduction for

acceptance of responsibility was level 35, criminal history category VI (292-365 months).  The

government sought the statutory maximum sentence of 240 months and Farrokh sought a sentence

of 63 months.  The court sentenced Farrokh to a variance sentence of 102 months.

     *United States v. Amin*, 1:15cr164 (E.D. Va. 2015)

     Amin pleaded guilty to attempting to provide material support to ISIL.  Amin attempted to

set up a revenue stream for ISIL through the use of bitcoins by creating a "Dark Wallet."  Amin

also facilitated an individual's travel to Syria to join ISIL.  The government noted that Amin "was

a prolific source of support, sophisticated advice, and facilitation of would-be ISIL members all

---

[7]Elhassan is scheduled to be sentenced in this Court on February 24, 2017.

over the world" and Amin's "conduct online and in person was well-considered, sophisticated and calculated to support ISIL. . ."  Amin's guidelines after the application of U.S.S. G. § 3A1.4 and a reduction for acceptance of responsibility was level 35, criminal history category VI (292-365 months).  The government recommended the maximum sentence at that time of 180 months and Amin sought a sentence of 75 months.  The court sentenced Amin to a variance sentence of 136 months

**Cases in other districts in which the defendants received variance sentences:**

*United States v. Wolfe*, 1:14 cr213 (W.D. Tex. 2014)

Wolfe pleaded guilty to attempting to provide material support to ISIL in violation of 18 U.S.C. § 2339A.  Wolfe planned to travel to Syria with his wife and children to join ISIL.  Wolfe made preparations to travel by raising funds to travel to Syria, purchasing a plane ticket to Turkey and obtaining certifications for his family's birth certificates to facilitate travel.  The court documents except the criminal information and judgment are sealed.  The court sentenced Wolfe to 82 months.

*United States v. Mohamed Abdullah Warsame*, 651 F. Supp. 2d 978 (D. Minn. 2009)

Mohamed Warsame pleaded guilty to providing material support to Al Qaeda in violation of 18 U.S.C. § 2339B.  Warsame attended Al Qaeda training camps in Afghanistan and intended to bring his family to join him but was told by Osama bin Laden that with his Canadian passport he could be of more value to Al Qaeda by returning to the West.  Warsame's guidelines after the application of U.S.S. G. § 3A1.4 and a reduction for acceptance of responsibility was level 35, criminal history category VI (292-365 months).  The government sought a variance sentence of 150 months from the statutory maximum sentence at that time of 180 months and Warsame

14

sought a variance sentence of 67 months.  After considering the sentences in dozens of other terror-related cases, the court sentenced Warsame to 92 months.

*United States v. Abdirizak Mohamed Warsame,* 16cr37 (D. Minn. 2016)

Abdirizak Warsame was charged with conspiracy to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339B.  Warsame was the emir of a group who at least on three occasions attempted to send persons to Syria to join ISIL.  After his arrest, Warsame cooperated with the government and testified against those who went to trial.  The government filed a § 5K1.1 motion for a downward departure for Warsame requesting a sentence of 54 months and the Warsame asked for a sentence of 18 months.  The court sentenced Warsame to 30 months.

*United States v. Abdullahi Mohamud Yusuf*, 15cr46 (D. Minn. 2016)

Abdullahi Yusuf was involved in the same conspiracy as Abdirizak Warsame and was charged with conspiracy to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339B.  Yusuf also cooperated and testified at trial.  The government asked for a sentence of 42 months and Yusuf asked for a sentence of 18 months time served.  The court sentenced Yusuf to 18 months time served.

*United States v. Abdifatah Yusuf Isse*, 09cr50 (D. Minn. 2013)

Abdifatah Isse was involved in a conspiracy involving providing personnel to a terrorist organization, Al Shabaab, and was charged with conspiracy to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339A.  Isse cooperated and testified at the trial of others involved in the conspiracy.  The government submitted a 5K1.1 motion under seal.  The court sentenced Isse to 36 months.

*United States v. Salah Osman Ahmed*, 09cr50 (D. Minn. 2013)

Salah Ahmed was involved with Abdifatah Isse in the Al Shabaab conspiracy.  Ahmed also cooperated and the government filed a 5K1.1 motion.  The court also sentenced Ahmed to 36 months.

*United States v. Avin Marsalis Brown*, 5:14cr58 (E.D. N.C.)

Avin Brown was charged with conspiracy to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339A.  Brown claimed that a friend was hurt in Syria and Brown want to join the fighting.  He planned to travel to Syria to join ISIL.  The court documents are sealed except for the court's judgment.  The court sentenced Brown to 92 months.

**Below are examples of cases in which the defendant was allowed to plead guilty to violations of other provisions for their offenses instead of § 2339.**

*United States v. Heather Elizabeth Coffman*, 3:15cr16 (E.D. Va. 2015)

Coffman pleaded guilty to providing a false statement involving international terrorism in violation of 18 U.S.C. § 1001(a).  Coffman is a case where the government did not charge a violation of 18 U.S.C. § 2339 but rather a significantly lesser offense of §1001 false statement which carried a maximum of 96 months for a case involving international or domestic terrorism.  Coffman attempted to assist a foreign national living outside the United States to travel to Syria to join ISIL.  Coffman also attempted to assist an FBI CI travel to Syria to join ISIL.  When confronted by the FBI, Coffman made false statements to protect the individuals.  The parties agreed not to seek a sentence outside the recommended guideline range of 46-57 months, the government seeking a sentence of 57 months and Coffman seeking a sentence of 46 months.  The court sentenced Coffman to 54 months.

*United States v. Mohamad Saeed Kodaimati*, 3:15cr1298 (S.D. Ca. 2016)

Saeed Kodaimati was charged with false statements involving international terrorism in violation 18 U.S.C. § 1001.  Saeed Kodaimati made false statements to the FBI regarding his involvement with ISIL while in Syria  The court documents are under seal.  The court sentenced Saeed Kodaimati to 96 months.

*Abdul Rhaeem Habil Ali-Skelton*, 16cr77 (D. Minn. 2016)

Ali-Skelton made false statements to FBI agents concerning his involvement with ISIL recruiters in Great Britain in violation of 18 U.S.C. § 1001.  After making the false statements, Ali-Skelton was arrested by local police after making terroristic threats at a Walgreens store.  Ali-Skelton pleaded guilty in state court to making terroristic threats.  He was subsequently charged with a violation of § 1001 in federal court.  Because the case involved international or domestic terrorism, the statutory maximum was 96 months.  The guidelines with the enhancement was level 29, criminal history category VI, 151-188 months.  The court sentenced Ali-Skelton to a variance sentence of 38 months.

*United States v. Shannon Conley,* 1:14cr163 (D. Co. 2014)   18 U.S.C. § 371

Conley joined U.S. Army Explorers to learn military training and skills which she intended to use while fighting for ISIL in Syria with a friend she met online.  Conley was allowed to plead to a § 371 conspiracy charge referencing § 2339B and was sentenced to 48 months by the court.

In all of these cases, the defendants received a substantial reduction or were permitted to plead to § 1001 or other violations which substantially reduced their exposure.  Those who cooperated with the federal government received time served or relatively short sentences for their offenses.  In nearly all cases, the government sought a sentence at the statutory maximum of 15 or

20 years depending on date of the offense.  While there is a fairly wide range of sentences in these cases, the court, in all these cases, granted a substantial variance.  Haris asks the Court to consider a substantial variance in his case also.

**Fine, Restitution.**

Haris can not afford to pay a fine, costs of incarceration, supervised release or probation.

**Sentencing Position.**

Haris asks the court to sentence him to a term of incarceration between 63-78 months. Haris also asks the Court to recommend placement in FCI Petersburg or FCI Cumberland so that he may be close to his family.

Respectfully submitted,

Haris Qamar
By Counsel

_____/s/_____
Alan H. Yamamoto VSB #25872
Attorney for Haris Qamar
Law Offices of Alan H. Yamamoto
643 S. Washington Street
Alexandria, Virginia  22314
Phone:  (703) 684-4700
Fax: (703) 684-6643
yamamoto.law@verizon.net

18

<u>CERTIFICATE OF SERVICE</u>

I certify that on the 13th day of February 2017, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Gordon D. Kromberg, Esquire
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA  22314

A copy of the foregoing will be emailed to

Nina Blanchard
U.S. Probation Office
401 Courthouse Square
Alexandria, Virginia

                    /s/
_____
Alan H. Yamamoto VSB #25872
Attorney for Haris Qamar
Law Offices of Alan H. Yamamoto
643 S. Washington Street
Alexandria, Virginia  22314
Phone:  (703) 684-4700
Fax: (703) 684-6643
yamamoto.law@verizon.net
