1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .      Criminal No. 1:16cr227
                              .
     vs.                      .      Alexandria, Virginia
                              .      February 17, 2017
HARIS QAMAR,                  .      2:59 p.m.
                              .
          Defendant.          .
                              .
. . . . . . . . . . .         .

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:             GORDON D. KROMBERG, AUSA
                                United States Attorney's Office
                                2100 Jamieson Avenue
                                Alexandria, VA 22314


FOR THE DEFENDANT:              ALAN H. YAMAMOTO, ESQ.
                                Law Office of Alan Yamamoto
                                643 South Washington Street
                                Alexandria, VA 22314


ALSO PRESENT:                   SA NICHOLAS CASLEN


OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                U.S. District Court, Fifth Floor
                                401 Courthouse Square
                                Alexandria, VA 22314
                                (703)299-8595



(Pages 1 - 26)



COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1                    P R O C E E D I N G S

2                      (Defendant present.)

3           THE CLERK:  Criminal Case 16-227, United States of

4    America v. Haris Qamar.  Would counsel please note their

5    appearances for the record.

6           MR. KROMBERG:  Good afternoon, Your Honor.  Gordon

7    Kromberg for the United States.  With me at counsel table is

8    FBI Special Agent Nicholas Caslen.

9           THE COURT:  Good afternoon.

10          MR. YAMAMOTO:  Good afternoon, Your Honor.  Alan

11   Yamamoto for Mr. Qamar.

12          THE COURT:  All right.  Mr. Yamamoto, as you know,

13   this matter comes on for sentencing.  Have you had enough time

14   to go over the pre-sentence report yourself and with your

15   client?

16          MR. YAMAMOTO:  Yes, Your Honor.

17          THE COURT:  Are there any factual corrections,

18   changes, additions, or deletions you want to have made to the

19   report itself?

20          MR. YAMAMOTO:  I don't think so.  In going over it

21   again in a better state of mind, it appeared to me that it

22   looked like there were more purchases than there were of the

23   Google cards.  It's my understanding they purchased about ten

24   in all in two or three transactions; but in reading the report,

25   it appeared that there were a number of different ones, when,

3

1  in fact, I think some of those paragraphs should have been

2  together, but it doesn't really change anything.

3          THE COURT:  It doesn't change any of the guideline

4  factors.

5          MR. YAMAMOTO:  No, no.

6          THE COURT:  All right.  Well, as you know, the

7  offense level calculated by the Probation Office is a level 35;

8  and your client's criminal history, although otherwise

9  qualifying as a level I, because of the nature of the offense

10  is now a level VI; and the advisory guideline range resulting

11  from that is 292 to 365 months, although the statute of

12  conviction carries a maximum of 240 months.

13          So the guideline range is above the statutory

14  maximum, correct?

15          MR. YAMAMOTO:  Correct, Your Honor.

16          THE COURT:  Now, the period of supervised release

17  under the statute could be as long as life.

18          MR. YAMAMOTO:  Correct.

19          THE COURT:  For the guideline range, it's one to

20  three years, and the -- it is -- there is a mistake in the

21  pre-sentence report.  The fine range should be 40,000 to

22  250,000 dollars.

23          MR. YAMAMOTO:  It doesn't matter.

24          THE COURT:  I know.

25          MR. YAMAMOTO:  He doesn't have the money.

4

1          THE COURT:  And there's a $100 special assessment.

2          So you're not actually disputing how the guidelines

3    were calculated?

4          MR. YAMAMOTO:  No, Your Honor.

5          THE COURT:  All right.  Then, Mr. Kromberg, we'll let

6    you speak first on behalf of the government.

7          MR. KROMBERG:  Your Honor, I think Mr. Yamamoto is

8    correct about the issue with the number of gift cards.  It

9    was -- some of the gift cards were purchased with the CW's

10   money.

11         THE COURT:  That being the cooperating person.

12         MR. KROMBERG:  The cooperator's money.  And Mr. Qamar

13   helped in transmitting and attempting to transmit the gift card

14   codes; but some of the cards were purchased by the, by the

15   cooperator without the money -- first without the participation

16   of the defendant; and some of the cards were purchased by the

17   defendant with the cooperator's money; and only a few cards

18   were purchased by the defendant with the defendant's money; but

19   in all of the cards, he did help to transmit the codes to what

20   he thought was an ISIS representative.

21         No matter how you slice it, it's a very small amount

22   of money; and that's one of the things to be considered here.

23   It's a small amount of money; but at the same time, Judge, it's

24   a course of conduct here that went on for two years; and the

25   first thing that happened in this case that we know about now

5

1    was that in the summer of 2014, Mr. Qamar bought a ticket,

2    spent $700 of his own money to buy a ticket to Turkey so that

3    he could go to join ISIS; and what he told the cooperator

4    almost a year later was that he didn't go because his parents

5    stopped him; and that's -- well, you couldn't ask the parents

6    to do anything more than that; but the thing is as soon as ISIS

7    was -- as soon as ISIS declared the Islamic State, he wanted to

8    go.

9            And then he got on Twitter; and over the course of a

10   year, he got closed -- his accounts were closed almost 100

11   separate times by Twitter.  Twitter would find these outrageous

12   posts, and they'd close them down, and he would start a new

13   account.

14           It wasn't a one-time thing.  It wasn't a capricious,

15   whimsical thing.  This was a concerted course of conduct that

16   went from the summer of 2014 until the spring of 2016; and only

17   in the spring of 2016 did the CW say to him, "Hey, my cousin

18   has made it to ISIS, and he's asked for these gift cards.  Can

19   you help?"

20           Now, keep in mind that the, the existence of this

21   cousin had been a topic of conversation.  The criminal

22   complaint mentions the time when Mr. Qamar asked the

23   cooperator, "Hey, you think your cousin likes the taste of

24   blood after he beheads people?"

25           And the cooperator said, "You know, my cousin is not

6

1    that kind of guy.  I don't think he does beheadings."

2              And, Mr. Qamar says, "I'd do beheadings."

3              There's something childish about it, but there's

4    something deeply disturbing about it because it wasn't just

5    this one time.

6              Now, I gotta tell you when I first got on the case,

7    Mr. Troccoli was the first lawyer on the case for the defense;

8    and Mr. Troccoli said, "Gordon, you're going to like this guy.

9    He's a nice guy."

10             And when Mr. Yamamoto came on the case, he said the

11   same thing to me.  And you know, when I met him, he is a nice

12   guy; but there's another side of him that's really scary

13   because it wasn't just one time.  It was day after day, week

14   after week, from 2014 to 2016, where he'd talk about how he

15   loves beheading and he loves slaughter.

16             This is not a -- this is not normal; and it's not

17   something that can be explained away as, okay, I was drunk, or

18   I was enthused; I had an adrenaline rush.  This is something

19   deep in this, in this person.

20             Now, I also note that, you know, he wrote a very nice

21   letter to your -- to the Court and saying that he was sorry;

22   and when he spoke to us, he seemed like he was sorry and he's

23   accepted responsibility and he's pled guilty; but you should

24   also know, Judge, in the criminal complaint, this is on tape,

25   paragraph 61 of the criminal complaint, he said that he learned

7

1    to be a chameleon, and he could lie about anything.

2            When the cooperator asked him if he was lying about

3    his support for ISIS, he said that he was not lying about that.

4    Qamar said, "I'm a professional liar.  How do you think I'm a

5    Dawlah supporter and no one fucking knows?"

6            That's what he said.  So when he -- when we perceive

7    him as, I gotta say, a nice guy, there's something else going

8    on here.  And the next time that someone comes up to him and

9    says, "Hey, would you like to support ISIS?" it might not be an

10   FBI informant.  It might be someone who's really connected with

11   ISIS, and then what's going to happen?

12           Mr. Yamamoto makes a good point when he says that,

13   you know, what happened in this case was pictures and a small

14   amount of money; but it's also true that the government did not

15   ask him -- the government agent did not ask him to do anything

16   else.  The next time is when someone asks him instead of taking

17   pictures or for some money, they said, "Hey, would you place

18   this package somewhere?  There could be blood and gore

19   involved."

20           I think you have to be concerned that a person who

21   can have these different sides of his personality in the same

22   body, you can't trust that the right side of his personality is

23   going to come out in the future.

24           Judge, I said in the pleading, which I know you've

25   read but because of the unusual nature of our, of our --

8

1          THE COURT:  Was it your quoting Karl Popper?

2          MR. KROMBERG:  Yes, yes.  There's an audience here,

3  so I should repeat, but I don't think there's any antidote to

4  the unfathomable blood lust and attraction to the depravity

5  that this defendant has in one part of him.  It's not all of

6  him.  Of course, it's not all of him; but I don't think anybody

7  could deny that this exists.

8          We had in the criminal compliant, it was not in the

9  pre-sentence report, that he tweeted on November 6, 2015, he

10  tweeted his hope that Auschwitz would be reopened for the

11  Kufar.

12          After the murders at the Bataclan theater in Paris,

13  where hundreds of people died, and his profile photo, not just

14  a photo, his profile photo on Twitter was the dead bodies on

15  the floor.  After the *Charlie Hebdo* attack, he tweeted that he

16  hoped for more of these type of attacks.

17          Your Honor had the sentencing of Mr. Ferizi last

18  month or very recently, the fellow who posted the kill list.

19  This defendant accessed the kill list, I don't think it was the

20  same kill list, but he accessed the kill list of U.S. military

21  members with their addresses.  He drove -- he told the

22  cooperator he drove by their house and he noticed -- houses,

23  excuse me -- and he noticed the police presence nearby.

24          In the criminal complaint, on March 15, 2016, we

25  pointed out that he had a photo of ISIS beheadings with a

9

1    caption:  "LOL," laugh out loud.  "Don't worry.  We're coming

2    for you, heathens."

3              And tweet:  "Give strength to the mujahideen to

4    slaughter every single U.S. military officer."

5              THE COURT:  Mr. Kromberg, I read your pleading,

6    obviously, very carefully; and I also noticed there was a

7    measured quality to your talking about the appropriate sentence

8    for this defendant.  You didn't give me a specific number that

9    the government was looking for other than it should be a, you

10   know, severe and serious sentence; but I'm wondering how does

11   this case differ from the case, if you can recall, involving

12   Mr. Farrokh?

13             MR. KROMBERG:  I can recall.  Mr. Farrokh, the span

14   of time that he was enthralled to ISIS was relatively short.

15   It was a few months.  And it's no disservice to Mr. Farrokh to

16   say that he was guided by someone smarter and more deeply

17   involved than he was, someone who was more knowledgeable, who

18   was feeding his information.  In fact, there were more than one

19   people -- more than one person who were feeding him

20   information.

21             Mr. Farrokh went to travel.  He tried to leave.  He

22   thought he was going to join ISIS.  He thought he was going to

23   fight, and he was caught at the airport on his way out.

24             In this case, Mr. Qamar didn't have anyone feeding

25   him information.  It was -- it went on for two years, not just

10

1   for a few months.  He went to try to go -- he bought the

2   ticket, which I think for him is a far bigger financial

3   sacrifice than it was for Mr. Farrokh; but he didn't go because

4   his family stopped him, which is again to his credit.  He's

5   less culpable than Mr. Farrokh because Mr. Farrokh actually

6   tried to go get on the plane and leave, but more culpable

7   because this, this defendant knew better than Mr. Farrokh did.

8   He was more committed to it.

9          Plus, in addition to the sentence he would get for

10  buying the ticket for trying to get to ISIS that way, then he

11  also had the photographs and he also had the Google Play gift

12  cards.

13         So if it were just trying to go fight for ISIS in

14  2014, I think he'd be more culpable than Mr. Farrokh because he

15  knew better but maybe less culpable because he didn't actually

16  go through with it; but you can't really compare the two

17  because in addition to trying to go fight for ISIS in 2014, he

18  also had the year-long support of ISIS on Twitter, he also had

19  the Google Play gift cards, and he also had the taking

20  photographs for what he hoped will be a video to encourage lone

21  wolf attacks against us, his fellow citizens in Northern

22  Virginia.  So I think he's significantly more culpable than

23  Mr. Farrokh.

24         THE COURT:  All right.  Mr. Yamamoto?

25         MR. YAMAMOTO:  Listening to that makes Haris sound

1    pretty scary.  Haris acts like an adolescent 16-year-old at

2    times and acts like a 26-year-old adult who takes

3    responsibility at times.

4           The government alleges that this went on for two

5    years.  I won't go through his background.  I was going to, but

6    it doesn't matter.  He graduates from high school in 2008,

7    starts work in 2009 at Wachovia Bank, works there until 2013,

8    working full-time.  When he leaves, he's the head teller.

9           He leaves there to get a better job, or more income,

10    actually, at Public Storage, where he works full time.  He

11    works Monday, Wednesday, Friday, Saturday, and Sunday, 40 hours

12    a week.  Tuesdays and Thursdays, he goes to class.

13           Now, in 2014, he became enamored with ISIS, or ISIL.

14    He did try to buy and, in fact, did buy a ticket in 2014.  His

15    parents did prevent him from going by keeping his passport away

16    from him.

17           In May of 2015, the FBI becomes interested in him.

18    They don't know anything about the ticket and trying to go

19    overseas.  They become interested because of all this obnoxious

20    stuff he's posting on Twitter.  Mr. Kromberg is right, he had

21    hundreds of Twitter accounts, or at least a hundred Twitter

22    accounts which were closed almost as soon as they were opened

23    because Twitter recognized him and shut them down before he

24    could do anything.

25           They send a CI in sometime after May of 2015.  During

12

1  that time, Haris tells the CI, "I tried to go overseas.  I

2  bought a ticket last year.  My parents wouldn't let me go."

3         The government then tries to talk Haris into buying

4  another ticket and trying to go by telling him, "Look, all you

5  need to do is get your birth certificate.  To get a birth

6  certificate in New York, you need to fill out the application,

7  make a photo ID of your driver's license, and send them $30,

8  not hard."

9         Haris tells the CI, "Well, let me think about it."

10         Instead, Haris goes and plays video games, which he's

11  addicted to.

12         Eventually, the CI says, "Well, what's going on with

13  the birth certificate?"

14         And Haris says, "I changed my mind.  I don't want to

15  go."

16         So at that point, they give up on the

17  get-this-guy-trying-to-go-overseas plan; and in May or so --

18  April or May -- excuse me, in January of this year, they come

19  up with the Google Play plan.  So the CI goes and says, "My

20  cousin wants to get these Google Play cards for ISIS so they

21  can communicate with people that want to come over."

22         Haris says, "Fine, but I don't have any money."

23         And for somebody that's committed, working full time,

24  you think he'd come up with some money, but he says, "I don't

25  have any money."

13

1              So the CI gives him money to go buy cards.  He buys
2    the cards.
3              Later on, the CI asked Haris, "Well, you said you
4    were going to buy cards.  Why didn't you buy cards?"
5              "I don't have any money."
6              "Haris, you spend your money on cigarettes and food.
7    Don't tell me you don't have any money."
8              Haris gives a big portion of his income to his family
9    to help with their expenses.
10             So the CI again gives Haris money to go buy cards.
11   Eventually, Haris does buy one or two cards; but that's it.
12   And he does help the CI send these codes; there's no question
13   about the things he did; but it's not like he's committed and
14   he's going to be fighting and doing everything he can for ISIL.
15   He makes money.  They ask for these $10 cards.  He doesn't have
16   the money to help buy them.
17             THE COURT:  But how do you respond to Mr. Kromberg's
18   concern that the next time, the question could be, "Do you mind
19   just dropping a package over here?"
20             MR. YAMAMOTO:  Because there's not going to be a next
21   time.
22             THE COURT:  Because he may be in custody.
23             MR. YAMAMOTO:  Because he is in custody and he now
24   knows better.  It's like an adolescent.  Sometimes you just
25   need to smack them upside the head, and that helps to set them

1   straight.

2          Haris, through all this time when he's talking

3   about -- to the CI about ISIL and cutting off people's heads

4   with a butter knife and drinking their blood, he's also talking

5   about going to school, playing video games.  He goes to school.

6   He got his associate's degree last June, was hoping to go to

7   VCU on a full-time basis to become a civil engineer.  His uncle

8   is a civil engineer.

9          Haris is good at math and science.  Haris's dad

10  wanted him to be a doctor or a lawyer, but Haris wants to be a

11  civil engineer.  He wants to build roads and help with sewer

12  systems in Saudi Arabia, or he wants to go to California to

13  work with his uncle.

14          I mean, he's a kid.  He's just a kid, and this

15  experience has taught him to keep his mouth shut and not, not

16  just sound off with the first thing that comes into your head

17  about what you -- what your reactions are after you see this,

18  that, or the other thing on the Internet.

19          So no, there's not going to be a next time.  I think

20  Mr. Kromberg is incorrect in thinking that the next time when

21  somebody comes to Haris and says, "Take this package," Haris is

22  going to say, "No, I'm not doing that."  And that's the chance

23  we have to take with anybody.

24          You've got -- and we'll get to some of these people

25  who got substantial variances, who on their own tried to go do

1  things for ISIL, either provide material support in the way of

2  money or personnel or tried to do other things.  The one person

3  who was going to buy an AR-15 so that there could be a massacre

4  on the 4th of July, you don't know what he's going to do the

5  next time.  Now, he did that on his own.  He wasn't, he wasn't

6  told by somebody:  You have to go do this or do that.  He

7  voluntarily did it.

8          So -- and his sentence was substantially reduced.

9  What are you going to -- you don't know.  You just don't know.

10  You just hope for the best, and in Haris's case, I don't think

11  that's taking a chance.  I think he will do what he said he's

12  going to do.  That's been his focus.

13          You don't take somebody who works five days a week

14  and goes to school the other two days and think they're not

15  focused on where, where they want to get to, and where he wants

16  to get to is his degree.

17          THE COURT:  Then why not stop?  I mean --

18          MR. YAMAMOTO:  He did, he did eventually stop.  He

19  was arrested in July.  Nothing -- it sort of petered out

20  because Haris, Haris actually didn't like the CI because the CI

21  was rude to people.  So as the conversations go on and you

22  listen, you find there are more and more times where the CI is

23  telling the FBI agents he's not available, he can't come, he's

24  gotta do this, he's gotta do that.

25          Well, what it is is Haris doesn't want to see this

16

1    guy anymore and just is not interested in doing anything more.

2    So it wasn't going on until the very end.  This whole process

3    just sort of died out.

4            THE COURT:  Did the Twitters all stop too?

5            MR. YAMAMOTO:  Twitters stopped too.  He went on

6    Twitter less and less because he became more and more focused

7    on work.

8            THE COURT:  Mr. Kromberg, did you want to respond to

9    that?

10           MR. KROMBERG:  I don't, I don't think that's exactly

11   right.  I think what the record is is that the gift cards were

12   in April and then the videotaping -- the pictures were in late

13   May and early June, and he was arrested on July 8.

14           MR. YAMAMOTO:  In July.

15           MR. KROMBERG:  Yeah.  So it took us several weeks to

16   organize ourselves.  It wasn't something we -- we didn't

17   catch -- I mean, we didn't arrest him in the act of anything,

18   but just a couple weeks after, I think three weeks, maybe four

19   weeks after the second incident with the videotaping, that's

20   when he was arrested.

21           THE COURT:  All right.  All right, Mr. Qamar, come

22   up -- was there anything else, Mr. Yamamoto, you wanted to say?

23           MR. YAMAMOTO:  I did, Your Honor.  The -- you've read

24   the letters from the family and friends.

25           THE COURT:  I have.

1      MR. YAMAMOTO:  You've read Mr. Goldman's letter,

2  which is particularly helpful in showing what kind of person

3  Qamar is -- Haris is, because the CI was with him at that time

4  when Mr. Goldman was going to sleep in his car; and Haris

5  said, "Come stay with me," even though Mr. Goldman was saying

6  crazy stuff like hacking this place and that place; but Haris

7  took him home, fed him, let him sleep overnight or stay

8  overnight, and then the next day made sure he got to the doctor

9  and got his meds and told him, "Go home.  Your parents love

10  you.  Go home."  Which he did.

11      I'll cut this short, Your Honor.  The thing I wanted

12  to bring up, you had asked Mr. Kromberg about some of these

13  cases.  The *Benkahla* case, the individual went to Pakistan and

14  Afghanistan and went to a jihad training camp, where he learned

15  to shoot automatic weapons and RPGs.  Judge Cacheris found that

16  the guidelines were overstated and also overstated the

17  likelihood that he would commit further acts in the future.  I

18  don't know what he did to find that, but that's what he found.

19  This is somebody that went over there voluntarily and went to

20  training.

21      The guidelines were 210 to 262, with a criminal

22  history of VI.  He got 121 months.

23      Mr. Jalloh last week before Judge O'Grady is a person

24  who went to buy and did buy an AR-15 rifle in North Carolina to

25  be used in a July 4 shooting.  Jalloh was a former National

1    Guard member.  His guidelines were 360 to life; the statutory

2    max was 240; he got 132 months.

3        Mr. Farrokh went to trial, was looking at a max of

4    240.  The guidelines were 292 to 365.  He was sentenced to 102

5    months.  He went -- he tried to travel overseas and was caught.

6        Mr. Amin sent money to ISIL and also was trying to

7    set up an Internet Dark Wallet program so that people could

8    send bitcoins to ISIL in this secret program.  He was

9    sentenced -- and his guidelines were 292 to 365.  He was

10   looking at 240 months.  He was sentenced to 136 months.

11       In the scheme of things, what Haris did is

12   substantially less than what these people did; and he didn't do

13   any of it on his own.  All these people went and did this on

14   their own initiative.

15       In Haris's case, it was the FBI through the CI that

16   came and said:  Hey, help us with this; help us with that.

17       Haris, like a fool, said:  Okay.  I'll help you.

18       THE COURT:  All right.  All right, Mr. Qamar, come up

19   to the lectern.  This is your chance to say anything you'd like

20   the Court to consider before sentence is imposed.

21       THE DEFENDANT:  Your Honor, I just wanted to say that

22   I've made a lot of mistakes in my life.  This one especially

23   has stained my soul.  I'm always going to regret this for the

24   rest of my life, and all I can honestly do is just ask for you

25   and the American public's forgiveness and a chance to make it

19

1   up to my parents, especially them.

2            THE COURT:  I mean, they're the worst victims in this

3   case.  You've just destroyed your mother and your father.

4            THE DEFENDANT:  Yeah.

5            THE COURT:  And they came to this country with dreams

6   of, you know, making a better life for you and your siblings,

7   and -- I don't understand.  After you were, your parents kept

8   you from going to Turkey in 2014, why did you keep all this

9   anger in you?  Why did you keep all these Twitter accounts, and

10  why were you so enamored of those pictures and making the kinds

11  of statements you were making?

12           THE DEFENDANT:  Honestly, like, I would -- I used to

13  tell the CI, you know, before I met up with him, I would watch

14  a bunch of horrific videos of, like, the death of children and

15  women and then, like, Russians dropping cluster bombs and stuff

16  like that; and, like, you know, I would, I would tell him what

17  I would see and what I would feel after seeing all, you know,

18  just watching them all burn or die and get killed for honestly

19  nothing.  They're not fighting or anything.  They're just

20  getting bombed in their homes, in the mosques, in the

21  hospitals, being intentionally killed on the streets.

22           And I would just, like, I'd just have a hard time

23  seeing, you know, not expressing myself or something like that

24  when I see something horrific.

25           THE COURT:  Well, what about, what about the Paris

1  murders?  Those were horrific, but you didn't seem to be upset

2  about those.

3            THE DEFENDANT:  I mean, at, like, at the time, it was

4  just like, because, like, France was doing something; and it

5  was just kind of like payback.  That's all it was, like, an

6  eye-for-an-eye kind of thing.  I mean, I didn't continue on

7  and, you know, like, dream about it or something.  At that

8  moment, that's what it was.

9            Honestly, like, the stuff I said was horrible, I know

10  that, but it was just -- at that moment, I was just so heated

11  about stuff that happened over there, France dropping bombs,

12  and then it just went back, then that happened, and just kind

13  of just seemed like that.  That's how it worked in my brain.

14            THE COURT:  All right.  Well, you know, words do

15  count; and in this type of an environment, those, those words

16  have come back to haunt you.

17            THE DEFENDANT:  Yeah.

18            THE COURT:  And I tell you, this is a different case

19  because this is not just a situation where the FBI developed a

20  confidential person who was working with you and somehow

21  entrapped you or planted, you know, criminal acts in your, in

22  your mind.

23            The fact that in 2014, you spent $700 of your money

24  to buy a ticket to go to Turkey, and as far as we can tell from

25  this record, but for your parents, you would have gone, and at

1   that point, whether you would have gotten into Iran, whether

2   you would have joined ISIS, we don't know, but I think

3   certainly the trend was in that direction, and I therefore

4   think that this is not just a case where the government somehow

5   implanted in you this concept of being pro-ISIS.

6          And even though it may not be a big deal, these small

7   contributions of monetary resources for these Google Play

8   cards, this is apparently a standard way in which they do get

9   some of their funding.

10          So I'm satisfied this is a very serious case; and

11   although I do think that, once again, the guidelines in this

12   particular case given your total conduct are overstated and

13   that the criminal history being bumped up to a VI is again a

14   great overstatement of your criminal history, nevertheless, the

15   sentence must be sufficiently severe to, number one, make it a

16   clear message to you that this kind of conduct is absolutely

17   not tolerated, it's very dangerous; and number two, to send a

18   message to anybody else who wants to engage in this kind of

19   behavior.

20          Now, I've taken into consideration the other similar

21   sentences -- similarly situated defendants; and I do think that

22   this defendant's case is quite close for different reasons to

23   that of Mr. Farrokh, who received a sentence of 102 months in

24   the custody of the Bureau of Prisons; and I'm satisfied that

25   that kind of a significant variance is appropriate in this case

22

1    because the defendant is young and there were indications that

2    perhaps he was finally outgrowing this kind of fascination with

3    blood and gore and ISIS and perhaps was getting ready to start

4    leading a better life; but I feel that a significant period of

5    incarceration, and this results in about eight-and-a-half

6    years, is necessary to achieve the purposes of Section 3553(a).

7    I'm satisfied this is a sufficient but not greater than

8    necessary sentence.

9              When you complete the 102-month sentence -- and you

10   will get credit for the time you've already served on that

11   sentence -- you'll be followed by a period of 20 years of

12   supervised release.  I want to make sure we have a long-term

13   ability to be able to monitor your behavior.

14             So during the period of supervised release, you must

15   first of all be of uniform good behavior, which means you

16   cannot violate any federal, state, or local laws, and that

17   includes traffic laws.  Do you understand that?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Secondly, you have to comply with all the

20   conditions of supervision, which will be printed on the

21   judgment order and explained to you by the Probation Office.

22   Do you understand that?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  Now, the first condition of supervision

25   is you must satisfactorily participate in such mental health

23

1    evaluation and treatment as directed by the Probation Office,

2    with a particular emphasis on de-radicalization.  Do you

3    understand that?

4              THE DEFENDANT:  Yes.

5              THE COURT:  You will have to take such medication and

6    engage in such therapy as directed by the mental health people,

7    and you must give up any privacy rights that you have to that

8    treatment program so the Probation Office can monitor your

9    progress.  The Court will waive the costs for that program.  I

10   want to make sure that finances do not interfere with your

11   ability to get that.

12             Secondly, you cannot have any contact or

13   communications with any individuals or groups involved in any

14   respect with promoting acts of violence or terrorism.  Do you

15   understand that?

16             THE DEFENDANT:  Yes.

17             THE COURT:  And that means you can't be e-mailing,

18   texting, tweeting, any kind of communication.  Do you

19   understand that?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Secondly, you may not possess any

22   computer or other communication device such as an iPhone or an

23   iPad without first getting permission from your probation

24   officer; and then you must agree to allow the Probation Office

25   to install such monitoring equipment -- and again, we're

24

1    talking several years down the road, so it may be more

2    sophisticated than it is now -- as needed to track any and all

3    communications that you are making.  And you will have --

4    notice will be posted on your devices so that anybody with whom

5    you are communicating will know that it's being monitored.

6            Do you understand that?

7            THE DEFENDANT:  Yes.

8            THE COURT:  All right.  The Court does not find a

9    sufficient evidence of drug abuse to require the mandatory drug

10   testing, but you are required to provide a drug test anytime

11   the Probation Office should demand it.

12           Do you understand that?

13           THE DEFENDANT:  Yes.

14           THE COURT:  The Court finds that you are unable to

15   afford the costs of incarceration, any costs of supervision, or

16   any of the statutory fines; but the $100 special assessment is

17   mandatory; and that must be made -- paid promptly.

18           Mr. Kromberg, were there any other conditions of

19   supervision that the government would want in this case?

20           MR. KROMBERG:  No, Your Honor.

21           THE COURT:  All right.  Mr. Yamamoto, anything

22   further?

23           MR. YAMAMOTO:  No.  Just a recommendation for

24   Cumberland or Petersburg or Butner.

25           THE COURT:  All right.  That's three:  Cumberland,

1    Petersburg, or Butner.

2            MR. YAMAMOTO:  I just threw in Butner.

3            THE COURT:  All right.  But, Mr. Qamar, you should

4    know that the Court does not control where you are designated;

5    and so if you don't wind up at one of those facilities, there's

6    nothing we can do on that respect.

7            Do you understand that?

8            THE DEFENDANT:  Yes.

9            THE COURT:  As I recall, you pled guilty; and

10   therefore, as part of your plea, you waived your right to

11   appeal both your conviction and your sentence.  You still

12   technically have a right if you want to file an appeal, you

13   have to file one within 14 days.

14           Mr. Yamamoto, if your client wants to file an appeal,

15   obviously, you go ahead and file the notice, all right?

16           MR. YAMAMOTO:  Yes.

17           THE COURT:  Anything further on this case?

18           MR. KROMBERG:  No, thank you, Your Honor.

19           THE COURT:  All right.  Then the defendant is

20   remanded.

21           We're going to recess court, and, Mr. Kromberg, if

22   you and your agent or Mr. Yamamoto can stay a little bit

23   afterwards, that will be fine.

24           MR. KROMBERG:  Yes, Your Honor.

25

26

1                    (Which were all the proceedings

2                     had at this time.)

3

4                CERTIFICATE OF THE REPORTER

5        I certify that the foregoing is a correct transcript of

6    the record of proceedings in the above-entitled matter.

7

8

9                                   _____
                                              /s/
10                                    Anneliese J. Thomson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25